United States District Court
Southern District of Texas
**ENTERED**
October 21, 2015
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| MALIN INTERNATIONAL SHIP REPAIR & DRYDOCK, INC., *et al*, | § § § | |
| Plaintiffs, | § | |
| VS. | § § | CIVIL ACTION NO. 3:13-CV-0039 |
| MODU PROSPECTOR, *et al*, | § § § | |
| Defendants. | § | |

## ORDER AND OPINION ON MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The Court has considered the Report and Recommendation of the United States Magistrate Judge (Dkt. 110), the Objections filed by Malin International Ship Repair & Drydock, Inc. ("Malin"), and the Response by Maxim Crane Works, LP ("Maxim").

In accordance with 28 U.S.C. § 636(b)(1), this Court is required to "make a de novo determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection [has been] made." In this regard, the Court is permitted to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*; *see also* FED. R. CIV. P. 72(b)(3).

As part of its de novo review, Court has considered Maxim's motion for partial summary judgment and Malin's cross-motion for partial summary judgment (Dkt. 94, 96, 98, 101), as well as Malin's motion for leave to file supplementary summary judgment evidence (Dkt. 103) and Maxim's response (Dkt. 104). After careful consideration of the

Objections, the Response, the pleadings, and the arguments of the parties, the Court will **ACCEPT** the Magistrate Judge's Recommendation, in part, and **REJECT** the Recommendation, in part.

For reasons set out more fully below, the Court **DENIES** both motions for summary judgment.

## PROCEDURAL SUMMARY

Malin and Maxim dispute the ownership of two large mobile cranes that were, at one time, located upon the *PROSPECTOR*. The *PROSPECTOR* has been variously described as a "Mobile Offshore Drilling Unit" (a "MODU"), a "semi-submersible rig," "a semi-submersible drilling vessel," a "Watercraft," a "rig (project)," and, perhaps most tellingly, "an un-useable large floating object."

These cranes were indisputably first owned by Maxim, who rented them to an entity known as PRC. PRC promised Maxim that the cranes would remain at "TNT Marine, 2915 Todd Rd., Galveston, Texas 77550," but PRC instead moved the cranes onto the *PROSPECTOR*, and then moved the *PROSPECTOR* to Malin's facility so that Malin could perform repairs and other work upon it.

However, PRC then failed to pay Malin's invoices. Malin filed this lawsuit, suing the *PROSPECTOR in rem* to enforce a maritime lien arising from the work Malin had performed upon it, and suing PRC for breach of contract and other claims. At Malin's request, this Court issued an order arresting the *PROSPECTOR*. Eventually, PRC and Malin jointly asked this Court to order the sale of the *PROSPECTOR* by the U.S. Marshal. At that sale, Malin purchased the *PROSPECTOR*, and by virtue of that

purchase, now claims ownership of several rented items that had been on or around the *PROSPECTOR*, including the mobile cranes that PRC had rented to Maxim.

After the sale of the *PROSPECTOR*, Maxim intervened in this lawsuit to seek a declaration that it is the owner of the cranes and a judgment against Malin for theft and conversion of the cranes under Texas law. In response, Malin also seeks a declaratory judgment that the cranes and other rented items are now owned by Malin "pursuant to the Order of this Court and the US Marshal's Bill of Sale free and clear of all liens, claims, and encumberances."

Maxim and Malin filed cross-motions for summary judgment on the ownership of the cranes, and the motions have been fully briefed and argued to this Court as well as the Magistrate Judge.

## FACTUAL OVERVIEW

The following factual overview is gleaned from the numerous pleadings in this case, as well as other cases on this Court's docket.

### 1. *THE PROSPECTOR* 1971 - 2003

Built in 1971, the *PROSPECTOR* boasts a long series of former owners and a rather checkered past. In 2003, the *PROSPECTOR* was owned by Diamond Offshore Services Company ("Diamond"), who described it at that time as a "[s]teel hulled, non-self-propelled, Marshall Islands flag, semi-submersible drilling vessel." (Dkt. 41-1). Diamond sold the *PROSPECTOR* to its next owner, with the conditions that (1) the new owner agreed to a complete "drilling ban", and (2) the new owner promised that "all

future owners would be made aware of and would agree to the terms of the ban." (Dkt. 41).

### 2. *THE PROSPECTOR* arrives at Malin in May 2012

In April 2010, the *PROSPECTOR* was known as the "*VIKING PROSPECTOR f/k/a OCEAN PROSPECTOR*," and it was located at the Gulf Copper shipyard in Galveston. In June 2010, it was sold to KTM Services, Inc., who intended to sell it for scrap. (Dkt. 41-2, 41-6). However, before KTM could scrap it, the *PROSPECTOR* was arrested by Gulf Copper, who claimed a maritime lien due to outstanding invoices, and it was sold at a Marshal's sale while it sat at Gulf Copper's facility. *See* 3:11-cv-00132. It was then purchased by Mr. Francisco Moreno, who in turn entered into a "Viking Prospector Joint Venture Dismantling Agreement" with PRC Environmental, Inc. ("PRC"), the stated purpose of that joint venture being to "dismantle, market and sell [the *PROSPECTOR*] as scrap." (Dkt. 41-7).

At some point in its history, the *PROSPECTOR* had large, stationary cranes upon it, but these stationary cranes had been removed by the time it was acquired by Mr. Moreno. Accordingly, on March 29, 2012, PRC rented two large mobile cranes from Maxim Crane Works. In the Rental Agreement, PRC promised that that the cranes "shall remain in [PRC's] possession and control at all times," and that they would be located at "TNT Marine, 2915 Todd Rd., Galveston, Texas 77550." (Dkt. 94-1). Notwithstanding these promises, PRC moved Maxim's cranes onto the *PROSPECTOR* and the *PROSPECTOR* was then moved to Malin's facility.

4

On May 10, 2012, PRC signed a "General Agreement" with Malin, agreeing that Malin would moor and berth the *PROSPECTOR* and "perform Work described [in the Agreement] and in various Contractor's Proposals . . . and in drawings and specifications provided by the Company."   (Dkt. 1-2).   The record does not contain any of these Contractor's Proposals, drawings, and specifications.   The Agreement does refer to "ongoing move preparations and sundry repair items in anticipation of the [*PROSPECTOR's*] final disposition" as well as "ensur[ing] the [*PROSPECTOR's*] condition and continued mobility and stability."   The Agreement also refers to "the [*PROSPECTOR's*] anticipated conversion pursuant to current rig conversion plans." Significantly, the Agreement also contained a prescient "Disclosure" stating, "Malin is very concerned about the possibility that the rig (project) may be abandoned, leaving Malin with an un-useable large floating object for disposal." (Dkt. 1-2).

### 3. Malin's Work on *THE PROSPECTOR*

When the *PROSPECTOR* first arrived at Malin's facility—with the cranes PRC had rented from Maxim—it was already deemed to be in poor condition, and its condition continued to deteriorate over time.   Nonetheless, Malin contends that PRC and Moreno decided against scrapping the *PROSPECTOR* and they instead decided that it should be towed to a distant location and converted into a "floatel."   There is no evidence in the record to provide the details of this alleged plan—instead, Malin's representatives merely affirm that Malin's scope of work included preparations for the *PROSPECTOR* to be towed, but the purpose and destination of the tow are unspecified.   There is also no evidence that Moreno and PRC's Joint Venture Agreement was ever amended to show

that its previous purpose of dismantling and scrapping the *PROSPECTOR* had been changed.

As part of its work, Malin removed heavy items from the *PROSPECTOR* and placed them onto Malin's dock. Malin's President affirmed that Malin used the cranes "to lift and lower materials from the *PROSPECTOR's* deck to the dock in preparation for an ocean tow." (Dkt. 96-6). PRC informed Malin that much of the equipment on the *PROSPECTOR*, including the mobile cranes, had been rented to—and was not owned by—PRC. (Dkt. 96-2).

### 4. Malin files suit, and the *PROSPECTOR* is arrested and sold

Shortly after its work on the *PROSPECTOR* began, Malin's fears that PRC would abandon the *PROSPECTOR* were realized—PRC stopped paying Malin's invoices. Malin alleges that, by February 2013, PRC owed it over $1.4 million. (Dkt. 1-3). Accordingly, Malin filed this lawsuit on February 14, 2013, alleging breach of contract and quantum meruit claims against PRC, and asserting a maritime lien under Rule C against the *PROSPECTOR*, and seeking the arrest of the *PROSPECTOR*. (Dkt. 1). Magistrate Judge Froeschner ordered the arrest of the "*MODU PROSPECTOR* (IMO # 8753213), her apparel, equipment, engines, freights, and tackle" the same day. (Dkt. 6).

By May 2013, Malin contended the *PROSPECTOR* was still "far from being a seafaring vessel" and instead "languish[ed] in a general state of disrepair" and was "generally unsafe". (Ex. A, A-3 to Dkt. 27). On May 1, 2013, Malin described the *PROSPECTOR* as: "a vessel that cannot be moved unless towed," "generally unsafe," "lack[ing] internal power" and unable to operate its internal lights and pumps,

"leak[ing]," "incapable of self-propulsion and [could] only be moved by being towed at great expense." (Dkt. 27). On May 24, 2013, Malin and PRC filed an "Agreed Order," jointly asking Magistrate Judge Froeschner order the *PROSPECTOR* be sold. (Dkt. 32). Accordingly, Magistrate Judge Froeschner ordered that, on July 15, 2013, the *PROSPECTOR* "shall be sold, as is, where is, with no warranties to the highest bidder, free and clear of all liens, preexisting claims and encumbrances on the rig." (Dkt. 33, 39).

Prior to the sale, a PRC representative notified Maxim that the cranes were on the *PROSPECTOR,* and that it had been arrested. (Dkt. 96-1).

At the July 15, 2015 sale, Malin, was the successful bidder at a price of $1,001,000.00, purchasing the *PROSPECTOR* as well as "her apparel, equipment, engines, freights, tackle and all other appurtenances of the rig at the time of sale". (Dkt. 96-5).

Approximately nine days after the sale, on July 24, 2013, Malin's Project Manager, Jordan Butler, sent an email to PRC, copying Malin's attorneys and other Malin employees and representatives. (Dkt. 98-2). Butler's email requested that PRC "[p]lease remove all equipment rented to PRC from the Prospector (cranes, mats & johns), including the air compressor, generator, and hoses required for ballasting. Malin does not wish to take over the rental on any of this equipment." No response from PRC, or subsequent retraction of Butler's request, appears in the summary judgment record.

After the sale was confirmed by this Court, Malin removed the remaining equipment of value from the *PROSPECTOR*, including the rented cranes. The *PROSPECTOR* was then dismantled and sold for scrap.

### 5. Maxim intervenes, claiming ownership of the cranes

Notwithstanding the *PROSPECTOR's* demise, this lawsuit continued. On April 4, 2014, one year after Malin filed this lawsuit, Maxim intervened to assert that it owned the cranes and bringing claims against Malin for conversion and violations of the Texas Theft Liability Act. (Dkt. 84). Malin responded by contending that it had acquired ownership of the cranes because they were "arrested and conveyed with the MODU PROSPECTOR pursuant to Orders of this Court and the U.S. Marshals Bill of Sale." (Dkt. 89). Alternatively, Malin argued that it could not be liable for conversion or theft because it held the cranes under "color of law" and a "good-faith" belief that it owned the cranes. Malin also filed a First Amended Complaint seeking a declaratory judgment that it owned the items that had been on the *PROSPECTOR*, including the cranes. (Dkt. 92).

Both Maxim and Malin moved for summary judgment regarding the cranes' ownership and Maxim's conversion and theft claims. (Dkt. 94, 96). The motions were fully briefed and were argued before Magistrate Judge Froeschner on March 5, 2015. (Dkt. 113). On March 13, 2015, Magistrate Judge Froeschner issued his Report and Recommendation, recommending that Maxim's motion for partial summary judgment on its ownership of the cranes be granted, and that Malin's cross-motion for summary judgment be denied. (Dkt. 110). Magistrate Judge Froeschner found that, "once the decision was made to scrap and destroy the Rig any 'appurtenance' liens on the cranes

were extinguished." The Court agrees with parts of Magistrate Judge Froeschner's recommended disposition, but for different reasons.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

If the movant produces evidence tending to show that there is no genuine dispute of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 321–323. The nonmovant must "go beyond the pleadings and by [his] own affidavits, or by depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue of material fact for trial." *Giles v. General Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001), citing *Celotex*, 477 U.S. at 324. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted." *Celotex*, 477 U.S. at 322-23.

When ruling on a motion for summary judgment, the Court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.) (citing *International Shortstop, Inc. v. Rally's*, 939 F.2d 1257, 1263 (5th Cir. 1991)), cert. denied, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Similarly, hearsay evidence, unless it falls within a recognized exception, is not competent summary judgment evidence. *See Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995). Additionally, allegations in a plaintiff's complaint are not evidence. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) ("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.*, 14 F.3d 1056, 1060 (5th Cir. 1995) (for the party opposing the motion for summary judgment, "only evidence—not argument, not facts in the complaint—will satisfy the burden."), *citing Solo Serve Corp. v. Westown Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991). Finally, the Court notes that Rule 56(c)(4) requires that, to be competent summary judgment evidence, an affidavit must be made on personal knowledge, set out facts that would be admissible, and show that the affiant is competent to testify on the matters stated. FED. R. CIV. P. 56(c)(4). Conclusory allegations are not sufficient evidence to create a fact issue. *Travelers Ins. Co. v. Liljeberq Enters., Inc.*, 7 F.3d 1203, 1207 (5th Cir.1993).

Further, parties have the obligation to specifically point out the evidence upon which they rely. Rule 56(c)(1) provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A); *Am. Fam. Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013). Under Rule 56(c)(3), "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). The Fifth Circuit has explained that, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) ; *see also Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988) (concluding that a deposition "was never made part of the competent summary judgment record before the district court" because the party opposing summary judgment "failed to designate, or in any way refer to, the deposition as the source of factual support" for its response to the summary judgment motion).

Malin and Maxim have filed cross-motions for summary judgment. The Fifth Circuit has noted that, "[t]he filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record. Indeed, the contrary is likely to be true if the parties have moved for summary judgment 'on different legal theories dependent on different constellations of material facts.'" *John v. State of La. (Bd. of Trustees for State Colleges and Universities)*, 757 F.2d 698, 705 (5th Cir. 1985) (internal citations omitted).

## ANALYSIS

Maxim seeks summary judgment on its declaratory judgment, conversion, and theft claims, arguing that Malin's purchase of the *PROSPECTOR* at the Marshal's sale could not have included the cranes because the law in the Fifth Circuit is that a judicial sale of a vessel does not transfer ownership of leased property aboard that vessel if the lessor never intended its property to become part of the vessel. *See, e.g., C.I.T. Corporation v. Oil Screw Peggy*, 424 F.2d 767 (5th Cir. 1970) (per curiam).

Malin also moved for summary judgment, contending that the cranes were appurtenances of the *PROSPECTOR*, and it therefore acquired ownership of the cranes through its purchase of the *PROSPECTOR*. Malin also contends that Maxim waived its right to contest Malin's acquisition of the cranes by failing to timely object to the auction. Finally, Malin argues that it is not liable for conversion and theft because, even if this Court determines that it does not own the cranes, Malin "maintained possession of the cranes under color of Court Order and Bill of Sale."

1. **Maritime liens are devices by which persons who furnish services and necessaries to a vessel may secure payment, and these liens attach to the vessel as well as the vessel's "appurtenances."**

"[A] maritime lien is a rough security device invented in the nineteenth century to keep ships moving in commerce while preventing them from escaping their debts by sailing away." THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 9-1 (5th ed.) (Updated Nov. 2014). The Maritime Commercial Instruments and Liens Vessel Identification Systems Act of 1988 specifies that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner ... has a

12

maritime lien on the vessel." 46 U.S.C. § 31342. This includes "claims under maritime contracts for repairs, supplies, towage, pilotage, wharfage, and a wide variety of other 'necessaries.'" SCHOENBAUM, § 9-1.

The overarching goal of the maritime lien system is to keep "the channels of maritime commerce open—by ensuring that people who service vessels have an efficient way of demanding reimbursement for their labor and are thus willing to perform the services necessary to keep vessels in operation." *Mullane v. Chambers*, 438 F.3d 132, 138 (1st Cir. 2006). Accordingly, Rule C of the Supplemental Rules for Admiralty and Maritime Claims provides that an action *in rem* may be brought to enforce such a maritime lien, by arresting the vessel itself until the lien is satisfied. FED. R. CIV. P. SUPP. R. C(1)(a). A Court may order the sale of an arrested vessel, and that sale then extinguishes all liens against the vessel. *Newpark Shipbuilding & Repair, Inc. v. M/V Trinton Brute*, 2 F.3d 572, 573 (5th Cir. 1993) ("a [M]arshal's sale discharges all liens against the ship and grants the purchaser title free and clear of liens").

In keeping with their historic importance to maritime commerce, maritime liens are difficult to extinguish unless they are fully satisfied. For example, although maritime liens can be extinguished by the total destruction of a vessel, this destruction must be complete—"If only part of a vessel is destroyed, however, the lien will attach to the remaining part." SCHOENBAUM, § 9-7; *see also The Fort Wayne*, 6 F. Cas. 119, 122 (S.D. Ohio 1861) ("[I]f any part of the vessel is saved, this lien adheres to it, even to the last plank.").

Further, maritime liens attach to more than just the hulk of the vessel itself—"a maritime lien on a vessel attaches to all of its components as well," including any "appurtenances" of the vessel. SCHOENBAUM, § 9-1. Thus, a judicially confirmed purchase of a vessel at a Marshal's sale includes all of the "appurtenances" to that vessel.

But the question of what is—and what is not—an "appurtenance" to which a maritime lien attaches is the subject of much dispute. *See* SCHOENBAUM, § 9-1 ("The determination is commonly made on a case-by-case basis without great consistency of results."); *see also* 70 Am. Jur. 2d Shipping § 141 ("Ships are usually transferred with their 'appurtenances,' and the question as to what that term includes cannot be definitely determined by any precise definition.").

### 2. Malin and Maxim disagree about the proper test for determining whether the cranes were "appurtenances" to the *PROSPECTOR*.

Both Malin and Maxim argue that the key to their dispute is whether the cranes were appurtenances to the *PROSPECTOR*. Each cites a number of maritime cases—of all vintages and pedigrees—to argue this point in their favor.

To argue that the cranes were not appurtenances to the *PROSPECTOR*, Maxim points to the Fifth Circuit's opinion in *C.I.T. Corporation v. Oil Screw Peggy*, 424 F.2d 767 (5th Cir. 1970) (per curiam), and contends that the intention of the lessor should be the primary dispositive factor. In turn, Malin contends that the cranes were appurtenances because they were items that were essential to the operations of the *PROSPECTOR*. *See, e.g., Canaveral Port Auth. v. M/V Liquid Vegas, Imo No. 8222941*, 6:09-CV-1447-ORL-28D, 2009 WL 3347596, at *4 (M.D. Fla. Oct. 15, 2009) ("The

parties agree that the test for whether certain equipment on a vessel is an 'appurtenance' subject to a maritime lien is whether a specifically identifiable item is destined for use aboard a vessel and is essential or necessary to the vessel's 'operation or mission.'"); *Gonzalez v. M/V Destiny Panama*, 102 F. Supp. 2d 1352, 1354 (S.D. Fla. 2000) ("An appurtenance is commonly defined as an item that is essential to the ship's navigation, operation, or mission."). Malin also argues that Maxim's caselaw—particularly its reliance on the *Oil Screw Peggy* from the Fifth Circuit—conflates the auction of a vessel after foreclosure of a preferred ship's mortgage with the auction of a vessel after its arrest and execution of a maritime lien.

The Court has diligently scoured the caselaw cited by both Malin and Maxim, and has conducted its own survey of legal authorities on this question. The Court finds that neither Malin nor Maxim is entitled to summary judgment at this time.

### 3. A genuine dispute of material fact precludes summary judgment for Malin.

Malin argues that the cranes were "appurtenances" to the *PROSPECTOR* because the cranes were "beneficial to the vessel and necessary for its operations." (Dkt. 96-1, pg. 11). Notably, however, each of the cases that Malin cites sets out a slightly different formulation of the definition, and none uses the exact phrasing advanced by Malin. *See, e.g., Canaveral Port Auth. v. M/V Liquid Vegas, Imo No. 8222941*, 6:09-CV-1447-ORL-28D, 2009 WL 3347596, at \*5 (M.D. Fla. Oct. 15, 2009) (courts should "consider[] the character of the property . . . against the nature and mission of the subject vessel. If the former is necessary or beneficial to the latter, the property should remain with the vessel .

. ."); *The Frolic*, 148 F. 921, 922 (D.R.I. 1906) ("[T]hat which would be an [e]ncumbrance to a ship one way employed would be an indispensable equipment to another; and it would be a preposterous abuse to consider them alike in such different positions. You must look to the relation they bear to the actual service of the vessel."); *Gowen, Inc. v. F/V Quality One*, 244 F.3d 64, 68 (1st Cir. 2001) (noting, "a maritime lien attaches . . . to equipment that is used aboard the vessel and is 'essential to the vessel's navigation, operation, or mission'" and finding lien extended to federal fishing permits issued to the fishing vessel, in part because "[m]aritime liens underpin the extension of credit to fishermen, and this mechanism for ready credit would be impaired by excluding from the lien the permits that allow vessels to carry on their accustomed fishing activities."); *Stewart & Stevenson Services, Inc. v. M/V Chris Way MacMillan*, 890 F. Supp. 552, 561 (N.D. Miss. 1995) (the "components of a vessel, even though readily removable, which are essential either for her general navigation or for the specific voyage upon which she is embarked become a part of the vessel itself and thus constitute appurtenances or apparel of the vessel.").

The Court declines to choose between the various definitions offer by Malin, i.e., to decide whether "an appurtenance" should be defined as something that is "necessary or beneficial" to the "nature and mission of the subject vessel;" or "indispensable . . . the actual service of the vessel;" or "equipment that is used aboard the vessel and is 'essential to the vessel's navigation, operation, or mission;'" or "components of a vessel, even though readily removable, which are essential either for her general navigation or for the specific voyage upon which she is embarked." No matter which of these tests is

16

employed, the summary judgment evidence in this case presents a genuine dispute of material fact.

Malin's summary judgment evidence included: (1) deposition excerpts from David Weinhoffer, who appears to be a representative of PRC; (2) deposition excerpts from Christopher Siebert, who appears to be another PRC representative; (3) this Court's order to arrest the *PROSPECTOR*; (4) this Court's order confirming the sale of the *PROSPECTOR*; (5) the United States Marshal's Bill of Sale; (6) the affidavit of George H. Lorton, the President and owner of Malin; (7) the affidavit of Troy S. Munn; and (8) two undated photographs of the *PROSPECTOR*. Malin also refers to its verified Original Complaint (Dkt. 1), its unverified First Amended Complaint (Dkt. 92), the Affidavit of Publication of the Marshal's sale (Dkt. 27-5), Malin's Motion to Confirm Sale (Dkt. 53), Maxim's Complaint in Intervention (Dkt. 86), PRC's Second Amended Answer and First Amended Counterclaim (Dkt. 91), and the affidavit of Kenneth Lookingbill attached to Maxim's motion for summary judgment (Dkt. 94-3). Malin has also supplemented the summary judgment record with email exchange between PRC and Maxim representatives that Malin contends is evidence that Maxim was aware that its cranes were "onboard" the *PROSPECTOR* by at least April 24, 2012. (Dkt. 103).

Maxim's summary judgment evidence includes the Rental Agreements signed by PRC, records showing that Maxim purchased the cranes in 1999 and 2006, and an affidavit by Maxim employee Kenneth Lookingbill with the cranes' replacement value and also stating that, although Maxim had rented the cranes to PRC, "Maxim never intended the cranes to leave PRC's worksite or be used on the *MODU PROSPECTOR*."

17

(Dkt. 94). Maxim also submitted additional deposition excerpts of Christopher Siebert; an email from Malin's Project Manager Jordan Butler to David Weinhoffer of PRC, asking that PRC "[p]lease remove all equipment rented to PRC from the Prospector (cranes, mats, & johns), including the air compressor, generator, and hoses required for ballasting. Malin does not wish to take over the rental on any of this equipment" and copying Malin's outside counsel and two other Malin representatives; and an August 14, 2013 demand letter from PRC seeking the return of the rented items. (Dkt. 98). Finally, Maxim has also supplied deposition excerpts of Kristofer Shelton, a PRC representative who testified that "[t]here wasn't a particular plan for the rig," and he was never told of a planned final destination or potential buyer for the rig—"Did I understand the vessel to have any purpose other than waiting for a finalized location? It served no -- I did not see a purpose in which it served until it was given a purpose." (Dkt. 104).

To support its contention that the cranes were appurtenances of the *PROSPECTOR* because they were "beneficial to the vessel and necessary for its operations," Malin points to the deposition of David Weinhoffer, a PRC representative, and the affidavits of Malin representatives George H. Lorton and Troy S. Munn. The cited portions of Weinhoffer's deposition appear to state his belief that the cranes were "the only things" on the *PROSPECTOR* that could be used to "move heavy items across and from one location on the deck to another," and that they were "required" to "maintain the seaworthiness of the vessel," particularly in case of a hurricane to allow the vessel to be "submerge[ed] on site." The affidavit of Malin's President George H. Lorton states that he is familiar with the *PROSPECTOR* and "vessels of that type," and he generally

18

described the *PROSPECTOR* "[as] a mobile offshore drilling unit; more specifically a semi-submersible drilling rig." Lorton then states that

> [b]ecause the *PROSPECTOR's* original deck cranes had been removed and their pedestals cut down, the *PROSPECTOR* lacked a means to conduct basic deck operations. The cranes PRC reportedly secured from Maxim and placed onboard the *PROSPECTOR* were necessary for the *PROSPECTOR's* operation and mission. . . They were used to lift and lower materials from the *PROSPECTOR's* deck to the dock in preparation for an ocean tow and they were the only means by which the vessel could perform that necessary work. They were the only on board equipment which, in the absence of the *PROSPECTOR's* fixed pedestal cranes, could be used to lift heavy items from one deck to another, and the wheels with which those cranes were equipped facilitated their movement to any particular location on the *PROSPECTOR's* main deck for the requirements of any particular lift.

Similarly, Troy Munn's affidavit states the cranes "were necessary and essential to the *PROSPECTOR's* operation" because they were "the only heavy-lifting cranes on the rig to conduct deck activities."

However, other evidence presents a genuine dispute as to these material facts. First, the Court notes there is a genuine dispute as to what, exactly, the *PROSPECTOR's* "mission" or "operations" might have been. Malin's own sworn pleadings show that by May 2013 the *PROSPECTOR* was no longer an operational "semi-submersible drilling rig" as Lorton general described it, but that it instead was "far from being a seafaring vessel," "languish[ed] in a general state of disrepair," was "generally unsafe," "cannot be moved unless towed," "leak[ing]," and was "incapable of self-propulsion and [could] only be moved by being towed at great expense." Although the affidavits of Lorton and Munn refer to the general "operations" of the type of semi-submersible drilling rigs that the *PROSPECTOR* may once have been, their statements do not offer evidence about the

"operations" of this particular and rather unusual specimen.[1]  This point is underscored by testimony of Kristofer Shelton that "[t]here wasn't a particular plan for the rig," and that "I did not see a purpose in which it served until it was given a purpose." (Dkt. 104).

Further, Maxim's summary judgment evidence contradicts Malin's assertion that the cranes were "essential" and "necessary" to the *PROSPECTOR*.  The email from Malin's Project Manager Jordan Butler plainly requests that PRC "[p]lease remove all equipment rented to PRC from the Prospector (cranes, mats & johns), including the air compressor, generator, and hoses required for ballasting.  Malin does not wish to take over the rental on any of this equipment."  This email disputes Malin's assertion that the cranes were necessary or essential to any mission, operation, and/or navigation of the *PROSPECTOR*.  Accordingly, the Court finds that Malin is not entitled to summary judgment on its claim that that the cranes were "appurtenances" to the *PROSPECTOR*.

### 4. A genuine dispute of material fact also precludes summary judgment for Maxim.

Similarly, Maxim's motion for summary judgment is predicated upon its contention that the intention of the lessor determines whether leased property becomes an appurtenance to a vessel that is auctioned to satisfy a maritime lien.  As with Malin's motion, even if the Court were to accept Maxim's definition of "appurtenance," a genuine dispute as to material facts precludes summary judgment in Maxim's favor.

---

[1] In fact, the parties' confusion on this issue was so profound that the Magistrate Judge Froeschner held that the *PROSPECTOR* was a "dead vessel" and was no longer "in navigation" as a matter of law.

To contend that it never intended the mobile cranes to be on board the *PROSPECTOR*, Maxim points to Lookingbill's affidavit as well as the Rental Agreement between Maxim and PRC. However, there is evidence that Maxim knew by April 2012 that its cranes were "onboard" an unnamed vessel, and there is no evidence that Maxim took any action to investigate or to retrieve its cranes. Further, there is evidence that Maxim was notified after the arrest of the *PROSPECTOR* that its cranes were onboard, and that the *PROSPECTOR* had been arrested. (Dkt. 96-1). Even if the Court did adopt Maxim's proposed test to determine whether the cranes were "appurtenances" to the *PROSPECTOR* a genuine dispute of material fact precludes summary judgment in Maxim's favor.

## CONCLUSION

After careful consideration of the Objections, the Response, the summary judgment record and briefing, and the arguments of the parties, the Court will **ACCEPT** the Magistrate Judge's Recommendation, in part, and **REJECT** the Recommendation, in part.

Because the Court's de novo review reveals that there are genuine disputes of material fact, the Court **DENIES** Maxim's motion for partial summary judgment (Dkt. 94), and **DENIES** Maxim's cross-motion for summary judgment on the cranes' ownership (Dkt. 96).   Malin's Objections to the Magistrate Judge's Report and Recommendation are **OVERRULED**.

**IT IS SO ORDERED.**

**Signed** at **Galveston, Texas**, on October 20th 2015.

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE